Nick Mihas, Appellee, v. Chesapeake and Ohio Railway Company, Appellant.

Gen. No. 32,370.

Opinion filed June 20, 1928. Rehearing denied July 5, 1928.

WILLIAM G. WISE, for appellant.

JOSEPH D. RYAN, for appellee.

MR. JUSTICE WILSON delivered the opinion of the court.

This is an action on the case brought by the plaintiff Nick Mihas, for personal injuries sustained on or about March 16, 1926, on the premises of the defendant company, in the city of Peru and State of Indiana. The suit was brought under the Federal Employers' Liability Act, the plaintiff having been an employee of the defendant at the time of the accident and for a number of years prior thereto, and resulted in a verdict in favor of the plaintiff and against the defendant in the sum of $20,000, and upon this verdict judgment was entered by the trial court and it is from this judgment that this appeal is prayed and is here for consideration.

As a result of the accident in question, plaintiff suffered the loss of an arm and other injuries and, as there is no question raised by counsel for defendant as to the amount of the verdict, it becomes unnecessary to set out the injuries in detail.

On the day in question it appears that the defendant company was maintaining and operating a certain switch yard, running in an easterly and westerly direction and bounded on the north by Canal street and on the south by the Wabash River. In the vicinity of the point where the accident occurred, the testimony discloses that there were five tracks consisting of a track known as a switching lead which extended east and west on the south side of the yard and that next to and north of this, and running in a paral-

lel direction, was the main track. North of the main track, and running in the same direction, was what was known as the house track, which extended a considerable distance north and south and was connected with the main track at a point considerably west of the point where the accident occurred. North of the house track, and running in the same direction, was house track No. 2, which curved into and connected with house track No. 1. West of house track No. 2, and running parallel to it and connected with house track No. 1, at a point 270 feet west of the place where the accident occurred was house track No. 3, the track upon which the accident in question happened. The three house tracks Nos. 1, 2 and 3 ultimately switched into and connected with the main line at a point over 1,000 feet west of the place of the accident. Track No. 3, which was commonly known as the team track, and which was the track running along the north side of the yard, was used for the purpose of placing cars which were to be loaded or unloaded by teams which, from the record, appeared to have access to said team track, either at the butt end of Cass street, or at Main street, two streets running in a northerly and southerly direction. Just north of the yard was Canal street running in an easterly and westerly direction. Cass street was a butt end street extending into the yard for a short distance and, from the record, it appears to have been used by teams for the purpose of entering upon the premises of the company in order to load and unload at that point. East of Cass street was Main street, a north and south street which extended into the switch yard of the defendant and was used in a similar manner by trucks and teams. In order to place cars upon the team track in question, it appears that the cars were taken along the main track and then switched back in an easterly direction to and

upon the team track. This switching point was a considerable distance west of the point of the accident.

At a point just south of Canal street and west of the butt end of Cass street, there was a small frame house or shack which had been furnished by the defendant for the use of Mihas as living quarters and it appears that he was subject to call at any time during the day or night. His employment was that of section hand and his duties required him to take care of the instrumentalities of the defendant which were used in interstate commerce, and it appears to have been stipulated by the parties that the defendant was, at the time of the accident, engaged in interstate commerce, so that no question was raised as to his right to maintain his action under the Federal Employers' Liability Act.

Mihas was 31 years old at the time of the accident and was a Greek who had been in this country for over 15 years. He started to work for the defendant in 1913, and had worked at the particular employment in which he was engaged at the time of the accident since 1921. He was required to take care of switch lamps and lights along the right-of-way of the defendant for a distance of about four miles. He was receiving, at the time of the accident, $3.60 a day and started to work about six o'clock in the morning, but was required to live upon the premises so that he would be subject to call at night, if necessary. In order that he might carry out his duties he was provided with a small speeder car which had three wheels and was operated by hand and could be lifted up and placed upon the track. This car was kept in a small building called the "Lineman's Shop," directly south of the habitation of the plaintiff and between the track known as the lead track at the extreme southerly side of the yard and the Wabash River, so that if the plaintiff proceeded from his house directly to the shop in

order to reach his speeder car, it would have been necessary for him to cross the five tracks hereinbefore referred to.

On the morning of the day of the accident plaintiff, according to his testimony, left the small frame house, furnished by the company, where he lived, at about ten minutes to seven and started for his speeder car. This house, where he lived, was situated 25 feet north of the team track and, as he reached this track, he looked both ways and saw cars extending east and west 400 or 500 feet. They were standing still at the time and he observed two men unloading coal from one of them onto a truck. This truck appears to have been located just north of the team track and at the end of Cass street and very close to the point where the accident occurred. According to plaintiff's testimony, he looked both ways and saw no engine or cars approaching these standing cars from the west. At a point some distance to the west, the track curved away from him, so that he would not have been able to see the approach of cars with the same advantage as he would have had if he had been standing on the inside of the curve, which would have been on the other side of this particular track. He testified further, that it was customary for the defendant when switching cars in, upon and along this particular team track to send someone ahead in order to notify teamsters that cars were to be placed upon said switch, or so that they could guard themselves against danger by reason of said cars coming in contact with those that were standing upon the team track and were being unloaded. He testified that, seeing no cars approaching and observing the teamsters unloading a car on the other track, he proceeded to cross over a coal car which was standing at a point directly in line between his house and the speeder in order to reach the point where his speeder car was kept and, as he was in the act of climbing up over said car, the cars standing on this

track were struck by some other cars switched in and upon the team track and he was thrown from the car and received the injuries in question.

It appears from the testimony that the collision was caused by a flying switch, the cars having been taken down the main track and then propelled with sufficient speed to carry them, by their own momentum, onto the team track, and that they struck the standing cars with considerable violence, so, as a result, the cars standing on the team track were moved some distance and, as testified to by Sam Cretas, one of the witnesses on behalf of the plaintiff, there was a crash and the coal was flying all over. William Sharp, a witness called on behalf of the plaintiff, testified that he was a sand and gravel contractor and was unloading some coal, at the time in question, onto a truck and that his son was helping him. They had been working on the morning in question unloading the coal since about six o'clock in the morning and had made a trip and had returned to the point in question, and that there were a lot of cars standing east and west from the coal car which was unloading; that he had just started away from the team track, when he heard the crash and had reached a point about 30 or 40 feet from the place where he had been unloading; that it was a couple of seconds after the truck started away that he heard the crash; that it was the uniform custom to notify persons unloading at this point whenever the defendant was about to run cars in and upon said track.

It does not appear from the evidence that there was any notification whatever on the morning of the accident by the defendant that it intended to place additional cars upon said team track.

It is urged as a ground for reversal that from the testimony, the plaintiff, in attempting to cross over the cars in question, was guilty of contributory negligence and that the defendant was not guilty of negli-

gence in making the flying switch in question. In support of this contention it is urged that the plaintiff could have proceeded down Canal street and crossed the tracks at a point several hundred feet to the east and come around the cars to the point of his destination. This would have necessitated his leaving the premises of the company and returning to the same premises, and would still require him to pass over a number of tracks in order to reach the shanty where his speeder was kept. We cannot see any force in the argument, particularly in view of the fact that his house was located on the premises of the defendant, and his daily occupation required him to proceed to the shanty where his speeder was located, which was also upon the premises of the defendant. It seems illogical to say that, where the defendant company had provided a habitation for its employee on the premises, he should be required to leave those premises in order to again return to them for the purpose of obtaining his car, and unless he did so, he was not exercising reasonable care for his own safety.

As to the question as to whether or not the defendant company was negligent in the manner in which they handled the cars in question on the team track, it is sufficient to say that, from the testimony, it appears that the cars must have proceeded over the track onto the team track at a considerable speed so that they struck the standing cars with a great deal more force than was requisite under the circumstances. So far as the public is concerned, and by that we mean people dealing with the defendant in unloading cars at the point in question, we are fully of the opinion that the flying switch, without any warning to those so engaged, was a negligent operation. It is urged by counsel for defendant that this may be true, in so far as the public is concerned, but that it owed no duty to the plaintiff and that, even though there may have

been a custom to warn teamsters, there was no obligation to warn plaintiff, as he was an employee of the defendant and not entitled to the same warning to which the public was entitled. It is urged that the trial court, in permitting evidence as to this custom, was in error. We cannot agree with this contention. An employee in the exercise of ordinary care has a right to rely upon those things which he has learned during the course of his employment and to act upon his general knowledge so obtained. If the plaintiff had been in the custom of proceeding directly from his home to the place where his speeder car was located and he testified that he had never been directed to do otherwise, and was required to cross over all the tracks in the switch yard, in doing so, it would appear to us that he had a right to rely upon the fact that, in crossing the track in question and finding that there were teamsters engaged in unloading a car and knowing that the company was in the habit of sending some one ahead of approaching cars which were to be placed upon said track in order to warn the teamsters, he was not guilty of contributory negligence in assuming that the company would do so on the morning of the accident in question. It would hardly be fair to say that, where a company had created by custom a certain usage, it should be allowed to go free from responsibility where it, in fact, by its servant, had violated the custom which the employee had grown to rely upon. This court in the case of *Otstot v. Indiana, I. & I. R. Co.*, 103 Ill. App. 136, where it was urged that safeguards and precautions were for the exclusive use and protection of the public, said:

"Whether such rules prevail in the various states as claimed, has no influence upon us in determining the issues in this case. The rule is well settled in Illinois, that a servant of a railroad company, though performing menial labor, like that of a section hand, whether in railroad yards or on private right-of-way,

is entitled to all the rights offered the public, either by ordinance, statute, or general custom of the company. *I. C. R. R. Co. v. Gilbert,* 157 Ill. 354; *St. L. A. & T. R. R. Co. v. Eggmann,* 161 Ill. 155; *E. St. L. C. R. R. Co. v. Eggmann,* 170 Ill. 538.''

The Supreme Court of this State in the case of *Pridmore v. Chicago, R. I. & P. R. Co.,* 275 Ill. 386, in its opinion says:

''It is also contended that the deceased, by reason of his being employed as a flagman, did not come within the class of persons protected by the provisions of the statutes and ordinances relating to the speed of trains, headlights upon locomotives and other warning signals. Employees of railroad companies working in private railroad yards or grounds within city limits or on railroad tracks are entitled to the protection of ordinances or statutes regulating the speed of trains within city limits and providing for the ringing of the bell or blowing of the whistle or the carrying of headlights on moving engines. *East St. Louis Connecting Railway Co. v. Eggmann,* 170 Ill. 538; *Illinois Central Railroad Co. v. Gilbert,* 157 id. 354.''

It is true in this case just cited the plaintiff was employed by another railroad company, but the language of the decision is broad enough to take in employees of the carrier, responsible for the accident. In the case of *Ehrlich v. Chicago G. W. R. Co.,* 160 Ill. App. 379, the court in discussing at some length the rights of employees to rely upon rules, regulations and ordinances, said:

''It is also true that employees and persons lawfully around tracks and trains have a right to rely upon the rules of the railroad company, as held in *C. & A. R. R. Co. v. Kelly,* 182 Ill. 267, and *C. & A. R. R. Co. v. Eaton,* 194 Ill. 441. In *Otstot v. I. I. & I. Ry. Co.,* 103 Ill. App. 136; *I. I. & I. Ry. Co. v. Otstot,* 113 Ill. App. 37, and *C. & N. W. Ry. Co. v. Thomson,* 128 Ill.

App. 594, we said that workmen upon a railroad right of way had a right to expect the master and its other servants operating trains to observe ordinances and statutes, and also rules and general customs of the company.''

Plaintiff at the time of the accident was engaged in interstate commerce. *Pedersen v. Delaware, L. & W. R. Co.*, 229 U. S. 146.

We have examined the cases cited by counsel in support of their contention, but are of the opinion that the general rule in this State seems to be that an employee is entitled to consider the rules and customs of his employer in governing his conduct while upon his employer's premises and has a right to rely upon the observance of such rule or custom by his employer as well as the general public would have such a right, and that the jury had a right to consider the fact that there was such a custom in force in the yards of the defendant company, where the accident occurred, in arriving at the questions as to whether or not the plaintiff, at the time of the accident was, himself, in the exercise of due care for his own safety.

For the reasons expressed in this opinion, the judgment of the trial court is affirmed.

*Judgment affirmed.*

HOLDOM, P. J., and TAYLOR, J., concur.